This is an action brought by the administratrix of Joe Pettit, to recover damages.
The complaint alleges the death of the intestate, his employment by the defendant as a messenger boy, the nature of his duties, a description of the place where he had to work, and then alleges specifically the acts of negligence complained of as follows:
"On 28 April, 1907, the said infant was given a message by the defendant, and carelessly and negligently directed by the defendant to deliver the same to another one of its employees, and to do so required the infant to go somewhere on the yard to track No. 9 or 10. About this time an engine with a number of cars of defendant, going south, passed, when the said infant undertook to go upon said slowly moving train to the point where the message was to be delivered. He stood upon the iron steps of a flat car in the said train, and suddenly the said car upon which he was standing, failing to clear another car standing on a track of the defendant, said infant was knocked from his position by coming in contact with the said car on the adjoining track; he was thrown between the wheels of the moving train and was so badly injured that he died the same afternoon."
The following evidence was introduced by the plaintiff:
Mrs. J. W. Spiers, formerly Mrs. Sallie Pettit, testified as follows:
Q. Your name is Mrs. J. W. Spiers? A. Yes.
Q. You are the mother of the young man, Joe Pettit, that was killed at South Rocky Mount? A. Yes. *Page 98 
Q. When were you married the last time? A. Last December, three years ago.
Q. At the time of your son's death you were Sallie Pettit? A. Yes, Sir.
Q. You have a record of the date of the birth of your son Joe? A. Yes, Sir.
Q. Will you please open this Bible and turn to the page in (121) question; is this a memorandum as to the date of the birth of your son Joe? A. Yes.
Q. And that record is that he was born on the 22d of June, 1895 or 1896? A. I can't tell.
Q. Do you remember the date? A. No, Sir.
Q. Do you know who made this record? A. Yes.
Q. Who? A. Next to my oldest daughter. For about four years it was my brother's Bible, and I had her draw mine off from his. He had the old record of all his children and mine.
Q. The date was recorded in your brother's Bible? A. Yes.
Q. And these dates were recorded at the time of the birth of the children? A. Yes.
Q. Do you know of your own knowledge how old he was? A. Yes; he was eleven years old; would have been twelve in June, 1907.
Q. Did you ever give your consent that this boy should go to that company to engage in this work? A. No.
Q. How was the boy dressed with reference to long or short pants? A. Short, knee pants.
Q. What number of clothes did he wear, with reference to pants? A. No. 12; No. 11 all the time before.
Q. Was he large or small for his age? A. He was not large at all; just ordinary size.
Q. About what time in the day was he killed? A. Somewhere about 12; I was sitting at the dinner table.
Q. How long after that before your child died? A. I think it was somewhere about 4 that same afternoon.
Cross-examination:
Q. When was the first time, Mrs. Spiers, that you heard that your boy was working for the railroad? A. When he got his job he told me.
Q. How long before this accident did he tell you he had a job? A. He told me as soon as he got his job.
Q. See if you can't remember how long before his accident? A. At the last time he had been at work for a week.
Q. How long the first time? A. About two months. *Page 99 
Q. It is alleged that he had been in the employment about (122) four days? A. Well, somewhere about a week; the last time I think it was on Tuesday he began, and was killed Sunday.
Q. But before he had been working about two months? A. Somewhere about that time.
Q. When he went there the second time did you tell him not to take it? A. No, sir; I don't think I did, but he said, "I am going back and take my same job, and — "
Q. Did you say not to do it? A. I don't remember what I said to him.
Q. The first time, did you tell him not to take it? A. I don't know, sir.
Redirect examination:
Q. Did you know just what duties he had? A. He told me he was a messenger boy; but I didn't know anything about it.
Q. Did you know anything about the danger attached to the job? A. No, sir. I had never been on the yard and I didn't know anything about it.
Q. Did you know how many tracks or trains there were there? A. No.
Q. Mrs. Pettit, how many other children have you? I have seven besides him.
Q. He told you he took the messages from one office to the other? A. Yes.
Q. Brought his money home? A. Yes, to me.
Mr. J. W. Spiers testified as follows:
Q. Mr. Spiers, you are the husband of the lady who left the stand? A. Yes.
Q. Mr. Spiers, you have been in the employment, off and on, of the railroad at Rocky Mount? A. Yes.
Q. You knew the condition of the yard at South Rocky Mount in April, 1907? A. Yes, Sir.
Q. Do you happen to know what duties Joe Pettit was discharging at the time of his employment? A. Messenger boy.
Q. In the office of Mr. E. S. Dodge? A. Yes, chief train dispatcher.
Q. And where were most of the messages to be carried? A. To the yardmaster's office; his office was placed diagonally (123) across from the dispatcher's at that time.
Q. And over how many tracks did he have to go? A. At that time he had to cross somewhere between eight or ten tracks; I don't exactly know at that time.
Q. The yard has been torn up and removed and these tracks have been torn up? A. Yes. *Page 100 
Q. Over these ten or twelve tracks between Dodge's office and the other office how many trains moved and how often? A. I can't tell; there was continuous shifting all the time. All the yard engines from the roundhouse had to be delivered there.
Q. When the trains come in were not all trains handled over these tracks? A. Norfolk and Charleston passenger trains were.
Q. What about the making up of these trains? A. Well, they were made up in the south yard and were left down in the south yard; they had to go over these tracks; all trains leading north.
Q. What became of the cars going north? A. They passed through the same tracks; they were made up in the northern end of the yard and passed over the main-line track.
Q. To what extent were these tracks being used? A. For classifying freight, loading and shipping freight, etc.
Q. How often? A. Continuously.
Q. What did you say Joe's duties were? A. Messenger boy.
Q. Took messages from the dispatcher's office to the yardmaster? A. Yes.
Mr. J. R. Pettit testified as follows:
Q. Look at that; do you remember that? A. Yes.
Q. Speaking with reference to that, that is what year? A. 1907.
Q. A wire that your brother has been hurt? A. Yes.
Q. You were living here at that time? A. No, sir; I was living at Rocky Mount, but I was over here that day.
Q. Did you know what your brother's duties were? A. Messenger boy to carry messages to any office he was sent.
Q. Court: Were there any other duties? A. He was supposed (124) to deliver messages to Mr. Robinson, Mr. Trueblood, and other offices on the yard.
Q. Just locate where these offices were and how many trains and tracks there were? A. Mr. Gorham's office was in the end of the principal shed and there were twelve tracks, I think, or more there at that time, and he had to cross these tracks to his office. Mr. Trueblood's office was across these tracks over between Mr. Gorham's office and the shop.
Q. What about the tracks there? A. He had to cross these same tracks. There was continued shifting and making up trains all the time during the day.
Q. What about Mr. Robinson's office? A. Robinson's office was back of the shop.
Q. How many tracks would he have to cross going to Robinson's office from the dispatcher's office? A. About fifteen or sixteen; it was behind the shop. *Page 101 
Q. Where was the office of the chief train dispatcher, Mr. Dodge, with reference to the main tracks of the A. C. L.? A. It was above the Coast Line restaurant.
Q. How far away from the main-line tracks? A. I don't really know exactly.
Q. As far as what? A. It was the distance of this building, or may have been more.
Q. About fifty feet? A. I suppose it was fifty feet or more.
Q. These tracks were in front of Dodge's office? A. Yes.
Q. How many of these tracks were there? A. There were only two main-line tracks and other tracks leading to them.
Q. How many of these? A. A good many of them; I don't remember how many.
Q. How many trains and shifting engines and engines and cars passed over these tracks? A. There was continuous shifting by trains for different points, Richmond, Florence, and Norfolk, over these tracks.
Q. Mr. Pettit, do you happen to know what your brother was receiving? A. $12.50 per month.
Cross-examination: (125)
Q. Mr. Pettit, you have spoken of his duties and the messages to take to the offices; how would he proceed to carry it there? A. Well, I suppose he would walk.
Q. Don't you know it was his business to walk from the point? A. Yes, I suppose that was the point of it.
Q. That was his business? A. Yes; that was part of it.
Q. Now, was there anything in his duty that required him to undertake to go upon a slowly moving train to the point where the message was to be delivered and ride upon iron steps of a freight car? A. I don't know.
Q. So when he attempted to ride a slowly moving train he did that because he wanted to? A. He did as all the others did.
Q. Didn't he do that because he wanted to? Yes, sir; and not only him, but all the others that age; there were more than him.
Redirect examination:
Q. There were other young children employed around the shop? A. Yes.
Q. The dispatches this boy had to deliver were telegrams? A. Yes.
Recross-examination:
Q. There were orders as well as telegrams? A. Any messages he might be given from the dispatcher's office.
Q. He would take any message? A. Yes. *Page 102 
Mr. Batts testified as follows:
Q. What is your name? A. J. W. Batts.
Q. Where do you reside? A. South Rocky Mount.
Q. What is your employment? A. Train engineer. I was fireman at the time of this accident.
Q. Fireman in April, 1907? A. Yes.
Q. In whose service? A. Atlantic Coast Line.
Q. Where were you on the day that Joe Pettit was killed? A. I was on the yard; had been out at work and just started home.
Q. At what time? A. Between 11 and 12.
Q. Did you see Joe Pettit that day? A. Once; I saw him on (126) the corner of the car.
Q. State what position he occupied on the car? A. He was standing on the steps and holding to the lower round.
Q. What kind of a car? A. Box car.
Q. In motion? A. Yes, moving.
Q. In what direction was it moving and where was the engine? A. At the southern end, the car was moving north.
Q. Did you see Pettit again this day? A. Yes, after he was run over.
Q. What attracted your attention? A. I heard some one scream out.
Q. Where did you find Pettit? A. He was lying on the track.
Q. What was his condition? A. One leg off.
Q. Do you know to what extent the tracks are used for the making up of trains and the classification of cars of the Coast Line? A. Yes.
Q. What was it; go ahead and state to the jury for what purpose they were used? A. They were put there for incoming trains and for making up trains going out.
Q. How frequently are engines and trains passing back and forth through the yard? A. Most all the time.
Mr. K. S. Lancaster testified as follows:
Q. Mr. Lancaster, do you know the condition of the yard of South Rocky Mount in April, 1907? A. I think so.
Q. Go ahead and tell the jury; describe it? A. Well, there was trains continually over the tracks; it was going and coming all the time; hardly ever more than two or three minutes without trains going backwards and forwards; about fifteen tracks there at that time.
Q. You were in the employment of the Coast Line at that time? A. Yes.
Q. Your duties called you upon the yard? A. Yes.
The plaintiff rested. The defendant moved for judgment of nonsuit; motion allowed, and plaintiff excepted. *Page 103 
The court signed the judgment of nonsuit as set out in the (127) record, to which plaintiff excepted and in open court appealed to the Supreme Court.
The plaintiff contends that the employment of the intestate, a child between eleven and twelve years of age, was so dangerous that it alone was evidence of negligence, and that he was killed in the performance of his duty.
The defendant contends: (1) That there is no evidence of negligence. (2) That if the employment of the intestate is evidence of negligence, there is no evidence that the intestate was on duty when killed, and therefore the negligence of the defendant was not the real cause of death.
After stating the case: The question presented by the record has, within a few years, been considered by this Court in six cases: Ward v. Odell,126 N.C. 948; Fitzgerald v. Furniture Co., 131 N.C. 645; Hendrixv. Cotton Mills, 138 N.C. 170; Rolin v. Tobacco Co., 141 N.C. 310;Leathers v. Tobacco Co., 144 N.C. 342, and Starnes v. Mfg. Co.,147 N.C. 563.
The last three were against manufacturing establishments, and were based on the statute (ch. 473, Laws 1903, now Rev., sec. 1981a), which provides: "That from and after 1 January, 1908, no child under twelve years of age shall be employed in any factory or manufacturing establishment in this State"; and we deduce therefrom the following principles:
(1) That the statute is constitutional.
(2) That it applies to employment in factories and manufacturing establishments, and to no other.
(3) That the employment of a child under twelve years of age in a factory or manufacturing establishment is engligence [negligence]per se.
(4) That such negligence is proximate, if the child is injured as the result of his employment.
(5) That there is no assumption of risk by the child.
(6) That the negligence of the parent, if any, in permitting the employment, cannot be imputed to the child. (128)
(7) That in addition to the usual presumption against contributory negligence, there is a presumption that the child has not the capacity to appreciate the dangers of his employment.
(8) That this presumption may be rebutted.
These decisions are not, however, authoritative in this case, because the employment of the intestate is not within the statute, and is not *Page 104 
forbidden by it, and we are not at liberty to extend the statute to include employments not within its letter or spirit.
In the Hendrix case, the boy was employed to work at the complicated machinery of a cotton mill, but as he was twelve years of age, the case was decided on the principles of common law, and not on the statute, and it was held that there was a failure of proof as to negligence and proximate cause.
In the Odell and Fitzgerald cases there was evidence of the negligence of the employer, outside of the dangerous character of the employment, in that in each there was evidence of a failure to instruct the child, and in both the question discussed was the correctness of instructions on contributory negligence.
The opinion in the Fitzgerald case was written by Chief Justice Clark. He quotes with approval the following language from Thompson on Negligence. "The law puts upon a master, when he takes an infant into his service, the duty of explaining to him fully the hazards and dangers connected with the business, and of instructing him how to avoid them. Nor is this all; the master will not have discharged his duty in this regard unless the instructions and precautions given are so graduated to the youth, ignorance, and inexperience of the servant as to make him fully aware of the danger to him, and to place him, with reference to it, in substantially the same state as if he were an adult."
He also refers to the statutes from many of the States, and from Europe, giving the ages at which children may be worked in factories, and concludes: "With this consensus of opinion in nearly the entire civilized world, it might be that it would not have been error if the judge had held that it was negligence per se to put a child of the tender age of nine years to work on a dangerous machine which he had (129) never seen before, without any instructions or warning, and to leave him there by himself without stopping the machine. But, however that may be, it certainly was not error to leave the question of negligence to the jury with the charge given in connection therewith, which was very favorable to the defendant."
Accepting this as a correct statement of the law, we must abide by it, and can permit a recovery of damages for no reason except that a child has been injured. We may have pity and may be inclined to heed "the sob of the child in its helplessness," but we must accept the law, as we understand it, as our guide in determining the rights of litigants, bearing in mind the admonition of Judge Daniel: "The courts should not be wiser than the law."
The question is not presented in this record, and therefore it is not necessary to decide it; but we might go further than the Fitzgerald case. and hold that when the employment is dangerous, it is not necessary to *Page 105 
prove a failure upon the part of the employer to instruct, and still there would be no evidence of actionable negligence in this case, because there is nothing in the evidence to show that the intestate was on duty, or was performing a duty for the defendant. The evidence is vague and unsatisfactory. No witness swears on what day the intestate was killed, but we assume it was on a Sunday in April, 1907. No one swears he was killed by a train of the defendant, but we accept this as proven, although it would have been easy to show signs of blood on the rails or track, which was not done. The only statement as to how the intestate was injured is contained in the answer of the defendant, which was not in evidence: "That the said Joe Pettit at the time he received the injuries alleged in the complaint was rendering no service to the defendant, and was where he had no right to be. That said Pettit, of his own will and accord, and against the warning of his companions, attempted to get on a passing flat car, missed his catch, fell, and the wheels of the car passed over and mashed his feet, without any fault of the defendant."
No witness says that the intestate was on duty the day he was killed, or that he was performing a duty for the defendant at (130) the time of his death.
These facts were not peculiarly within the knowledge of the defendant, as his mother and stepfather knew whether or not he was on duty that day. Both knew he was employed by the defendant, and the mother received his wages.
The evidence, accepting it as true, shows that he was a messenger boy to carry messages, and that he had to cross the tracks; but there is no suggestion that he had to ride passing freight trains to perform these duties.
We repeat here the evidence of the witness Batts, who is the only witness who testifies to any fact connected with the killing:
Q. What is your name? A. J. W. Batts.
Q. Where do you reside? A. South Rocky Mount.
Q. What is your employment? A. Train engineer. I was a fireman at the time of this accident.
Q. Fireman in April, 1907? A. Yes
Q. In whose service? A. Atlantic Coast Line.
Q. Where were you on the day that Joe Pettit was killed? A. I was on the yard; had been out at work and just started home.
Q. At what time? A. Between 11 and 12.
Q. Did you see Joe Pettit that day? A. Once; I saw him on the corner of the car.
Q. State what position he occupied on the car? A. He was standing on the steps and holding to the lower round.
Q. What kind of a car? A. Box car. *Page 106 
Q. In motion? A. Yes, moving.
Q. Did you see Pettit again this day? A. Yes, after he was run over.
Q. What attracted your attention? A. I heard some one scream out.
Q. Where did you find Pettit? A. He was lying on the track.
(132) Q. What was his condition? A. One leg off.
Q. Do you know to what extent the tracks were used for the making up of trains and the classification of cars of the Coast Line? A. Yes.
Q. What was it; go ahead and state to the jury for what purpose they were used? A. They were put there for incoming trains and for making up trains going out.
Q. How frequently are engines and trains passing back and forth through the yard? A. Most all the time.
The clear inference from this evidence is that the intestate, acting outside of the line of duty, jumped on a passing train, fell off, and was injured.
If we confined the plaintiff strictly to the allegations of the complaint, the case would be stronger against her, as no one could urge that there is any evidence that the intestate was knocked off the car by coming in contact with a car on another track.
The plaintiff was not inadvertent to the necessity of proving that the intestate was on duty, because he alleges that the intestate was in the discharge of his duty, and was engaged in delivering a telegram, but he offered no evidence to sustain these allegations.
After a careful consideration of the case, we conclude that his Honor committed no error in ordering a nonsuit.
No error.